IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

KHALED M. ABDEL MOATY        )
                             )
            Plaintiff,       )
                             )
v.                           )        Civil Action No. 1:15cv0079 (JFA)
                             )
CAROLYN W. COLVIN,           )
Acting Commissioner,         )
Social Security Administration, )
                             )
            Defendant.       )
_____)

## MEMORANDUM OPINION

This matter is before the court on cross-motions for summary judgment.  Plaintiff seeks

judicial review of the final decision of Carolyn W. Colvin, Acting Commissioner of the Social

Security Administration ("Commissioner"), denying plaintiff's claim for disability insurance

benefits under Title II of the Social Security Act.  The Commissioner's final decision is based on

a finding by the Administrative Law Judge ("ALJ") and Appeals Council for the Office of

Disability Adjudication and Review ("Appeals Council") that claimant was not disabled as

defined by the Social Security Act and applicable regulations.[1]

On April 28, 2015, plaintiff filed a motion for summary judgment along with an

incorporated memorandum in support.  (Docket no. 17).  Thereafter, defendant submitted a

motion for summary judgment (Docket no. 18), a memorandum in support (Docket no. 19), and

a memorandum in opposition (Docket no. 20).  The two briefs submitted on behalf of the

---

[1] The Administrative Record ("AR") in this case has been filed under seal, pursuant to Local Civil Rules 5 and 7(C). (Docket no. 14).  In accordance with these rules, this opinion excludes any personal identifiers such as plaintiff's social security number and date of birth (except for the year of birth), and the discussion of plaintiff's medical information is limited to the extent necessary to analyze the case.

Commissioner are identical. (Docket nos. 19, 20). The plaintiff having chosen to forego submitting a reply brief, the court finds this matter ripe for disposition. For the reasons set forth below, plaintiff's motion for summary judgment (Docket no. 17) will be denied; the Commissioner's motion for summary judgment (Docket no. 18) will be granted; and the Commissioner's final decision will be affirmed.

## I. PROCEDURAL BACKGROUND

Plaintiff submitted his application for disability insurance benefits on June 30, 2011, alleging a disability onset date of May 27, 2011. (AR 202). Plaintiff's application also indicated that plaintiff filed (or intended to file) for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act.[2] On October 12, 2011, the Social Security Administration sent plaintiff a notice of disapproved claim that provided, in part: "We are writing about your claims for Social Security and Supplemental Security Income (SSI) disability benefits. Based on a review of your health problems you do not qualify for benefits on either claim." (AR 102–07).

On November 9, 2011, plaintiff signed a form entitled "Appointment of Representative," authorizing Julie H. Heiden, Esq. to act on plaintiff's behalf with respect to "claim(s) or asserted right(s) under: Title II (RSDI) [and] Title XVI (SSI)." (AR 109). Counsel submitted this form to the Social Security Administration along with a request for reconsideration on November 9, 2011. (AR 109, 112). On March 7, 2012, after conducting an independent review of the available medical evidence, the Social Security Administration found that the previous determination denying plaintiff's claim was proper. The notice of reconsideration explained plaintiff's ability to appeal the decision to an ALJ within 60 days. (AR 113).

---

[2] Documents entitled "Disability Determination and Transmittal" indicate a filing date of June 30, 2011 for Title II "DIB" (AR 85) and a filing date of May 27, 2011 for Title XVI "DI" (AR 86). Both documents include the remark: "Concurrent Title II/XVI claim" (AR 85, 86).

Plaintiff's "Request for Hearing by Administrative Law Judge" was received by the Office of Disability Adjudication and Review on May 7, 2012. (AR 120). Following a conversation with the plaintiff, the Social Security Administration summarized the relief sought as follows:

> I disagree with the determination made on my claim for Disability-Work or Child Benefits because I do not believe the full nature and extent of my condition was considered nor was my complete medical file reviewed when the determination was made regarding my eligibility for disability benefits.

(AR 121). Thereafter, the Social Security Administration scheduled a hearing on May 29, 2013 in Washington, D.C. (AR 130), subsequently amended to June 17, 2013 (AR 148), and again to September 9, 2013 (AR 178). During the hearing on September 9, 2013, plaintiff provided testimony at the direction of counsel and answered questions posed by the ALJ. (AR 31–60). A vocational expert appeared by phone. (AR 34). On October 15, 2013, Judge Thawley issued a written opinion denying plaintiff's claim for disability insurance benefits under Title II of the Social Security Act. In reaching this decision, the ALJ concluded that plaintiff had not been under a disability within the meaning of the Social Security Act (sections 216(i) and 223(d)) from May 27, 2011 through October 15, 2013. (AR 13–25).

On December 13, 2013, plaintiff filed a request for review with the Appeals Council, claiming that the ALJ

> erred in finding the Claimant does [not] have an impairment or combination thereof that does meet the severity of the listed; erred in finding the Claimant has residual functional capacity to perform light work, erred in finding there are jobs that exist in significant numbers the Claimant could perform; and erred in finding the Claimant has not been under a disability from May 27, 2011 to present.

(AR 8). The Appeals Council denied plaintiff's request for review on November 17, 2014. (AR 1–3). As a result, the ALJ's decision became the final decision of the Commissioner. As stated in the "Notice of Appeals Council Action," plaintiff was given sixty (60) days to file a civil

action challenging the decision. (AR 1–3). The notice also provides: "We assume you receive this letter 5 days after the date on it unless you show us that you did not receive it within the 5-day period." (AR 2). On January 21, 2015, plaintiff filed this civil action seeking judicial review of the Commissioner's final decision. (Docket no. 1). On May 7, 2015, an order of referral was entered following the parties' consent to the exercise of jurisdiction by a United States Magistrate Judge. (Docket nos. 22, 23). This case is now before the court on cross-motions for summary judgment. (Docket nos. 17, 18).

## II. STANDARD OF REVIEW

Under the Social Security Act, the court's review of the Commissioner's final decision is limited to determining whether the decision was supported by substantial evidence in the record and whether the correct legal standard was applied in evaluating the evidence. *See* 42 U.S.C. § 405(g); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Hays*, 907 F.2d at 1456 (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). While the standard is high, where the ALJ's determination is not supported by substantial evidence on the record, or where the ALJ has made an error of law, the district court must reverse the decision. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

In determining whether the Commissioner's decision is supported by substantial evidence, the court must examine the record as a whole, but may not "undertake to re-weigh the conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the Secretary." *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001) (alteration in original) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). The Commissioner's findings as to any fact, if the findings are supported by substantial evidence, are conclusive and must be affirmed. *See*

4

*Perales*, 402 U.S. at 390. Moreover, the Commissioner is charged with evaluating the medical evidence and assessing symptoms, signs, and medical findings to determine the functional capacity of the claimant. *See Hays*, 907 F.2d at 1456–57. Overall, if the Commissioner's resolution of conflicts in the evidence is supported by substantial evidence, the district court must affirm the decision. *See Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966).

## III. FACTUAL BACKGROUND

### A. Plaintiff's Age, Education, and Employment History

Plaintiff was born in 1965 and was forty-eight years old at the time of the ALJ's decision. (AR 24). Plaintiff was raised and educated in Egypt, where he completed four years of college. (AR 48, 241). In September 1991, plaintiff immigrated to the United States and began working for his uncle at a local food store. Plaintiff later worked as a butcher and "meat manager" at various retail food stores from 1993 to 2011. (AR 254). Plaintiff's primary responsibilities included processing deliveries, assisting customers, and managing other employees. (AR 37). In January 2011, plaintiff began experiencing symptoms associated with vertigo and sought treatment once those symptoms began affecting his ability to work. (AR 365). Medical records indicate that plaintiff stopped working in May 2011 due to dizziness, tinnitus, and recurrent falls. (AR 240, 397–98).

### B. Summary of Plaintiff's Medical History[3]

A review of the submitted medical records indicates that plaintiff began experiencing some form of physical impairment following a work-related injury on July 4, 2006. (AR 331). Subsequent physical examinations and MRIs revealed a labral tear of the right shoulder and a meniscus tear in the right knee. (AR 331). Plaintiff attempted non-surgical treatment through

---

[3] The Administrative Record contains approximately 400 pages of medical records from various sources relating to plaintiff's medical treatments. This summary provides an overview of plaintiff's medical treatments and conditions relevant to his disability claim and is not intended to be an exhaustive list of each and every medical treatment.

medication and physical therapy until September 21, 2006, when plaintiff underwent an

arthroscopic procedure to repair the medial meniscus in his right knee. (AR 321). Plaintiff made

slow but significant progress through physical therapy and was cleared to return to full-duty

work after reaching "maximum medical improvement" on March 12, 2007. (AR 330–31).

Plaintiff also achieved full range of motion in the right shoulder with no instability and no

impingement. (AR 330). In a report dated March 28, 2007, Marc B. Danziger, M.D. ("Dr.

Danziger") indicated that the right shoulder could become symptomatic, but concluded that

further medical treatment was not necessary at this time. (AR 332).

Despite several physical examinations indicating medical improvement, plaintiff

continued to report joint pain in his right knee, right shoulder, and lower back throughout 2007

and 2008. (AR 334–50). Beginning in May 2007, plaintiff complained of recurring joint pain in

both his right knee and right shoulder. (AR 333). Shortly thereafter, a second MRI of plaintiff's

right knee revealed a re-tear of the medial meniscus and a small lateral meniscus tear. (AR 334).

Dr. Danziger suggested an arthroscopic procedure to address the re-tear, which was completed

on July 26, 2007. (AR 334–35). Plaintiff made significant progress during the recovery period

and expected to return to full-duty work in September 2007. (AR 336).

On September 4, 2007, plaintiff began discussing options related to the surgical repair of

his right shoulder, which was diagnosed as a superior labral tear from anterior to posterior

("SLAP") and rotator cuff tendonitis. (AR 337, 340). On November 27, 2007, Dr. Danziger

recommended addressing those injuries through a right shoulder arthroscopy. (AR 340). During

this time, plaintiff's employer required a full-year of work before allowing medical leave. (AR

341). As a result, plaintiff continued light duty deskwork until coverage for the surgery and

subsequent medical leave could be obtained. (AR 341–42). On March 13, 2008, plaintiff

underwent arthroscopic surgery on his right shoulder. (AR 343). Plaintiff successfully completed physical therapy, obtaining nearly full range of motion by May 20, 2008. (AR 346). Plaintiff's right shoulder reached "maximum medical improvement" in July 2008, while treatment continued to focus on medial joint line tenderness in his right knee. (AR 347).

Despite improvement in the right shoulder, plaintiff continued to experience medial joint line pain in his right knee. (AR 345–47). A re-tear of the meniscus was suspected, but an MRI revealed only a questionable lateral meniscus tear with all other major ligaments intact. (AR 346). On July 11, 2008, x-rays confirmed cervical disc narrowing and aggravation of underlying degenerative disc disease in plaintiff's neck with radiculopathy. (AR 348). Plaintiff returned for a follow-up evaluation on July 22, 2008 to discuss alternative treatment options, including an MRI of the neck and epidural steroids. (AR 348–49). On August 5, 2008, Dr. Danziger ordered an MRI of the lower back and cervical spine to confirm a diagnosis of degenerative disc disease. During this time, medical records indicate that plaintiff spent several months either on leave or performing "light work" in other departments. (AR 347).

The administrative record contains limited references to plaintiff's medical treatment during 2009 and 2010. As a result, a summary of relevant medical records has been limited to the information available. Upon referral by his primary care physician, plaintiff presented to the Colon, Stomach, & Liver Center, LLC and the Loudoun Endoscopy Group on October 20, 2010 with complaints of painful bowel movements and bloody stool. (AR 394). Although the initial physical exam was unremarkable, the attending gastroenterologist recommended a colonoscopy "to rule out any IBD or malignancy." (AR 394–95). The procedure was performed on December 9, 2010 without complication and plaintiff was discharged with treatment instructions related to internal hemorrhoids. (AR 395). Another post-operative entry reveals that plaintiff

7

was prescribed 10 mg of Bentyl following the procedure on December 9, 2010. (AR 393).

Lastly, a letter provided by the Virginia Spine Institute indicates plaintiff sought consultation for "acute onset of back pain while at work approximately one year ago in February 2010 . . . [but] did not seek further care as he thought it would get better." (AR 437).

On March 22, 2011, plaintiff presented to Daniel Hwang, M.D., ("Dr. Hwang") an ear, nose, and throat specialist, for a physical examination. (AR 372–74). Treatment notes reveal that plaintiff complained of "dizziness with head movement, right side tinnitus, [and] hearing loss for several years" and was referred to a neurologist and an audiogram and ENG test were ordered. (AR 373–74). On April 4, 2011, Robert Richard, M.D. ("Dr. Richard") conducted a comprehensive neurological examination at the Neurology Center of Fairfax, Ltd. (AR 464). The examination revealed vertigo when moving from a right supine to vertical position that did not extinguish on subsequent retesting, potential episodic reduced hearing in the right ear, and no observable nystagmus, with the remainder of the exam categorized as "normal." (Id.). Dr. Richard instructed plaintiff to return for a neurological follow-up after completing "an MRI of the brain with attention to the [internal auditory canals], [electrocochleography examination], and the already recommended [videonystagmography] and audiometry test." (Id.).

Plaintiff presented to Professional Hearing Services: The Dizziness and Balance Center for a hearing and videonystagmography ("VNG") examination on May 11, 2011. (AR 354). While an audiometry test revealed normal hearing in both ears, the VNG examination was "suggestive of an uncompensated non-localizing peripheral vestibular pathology." (Id.). These results were also reviewed by Dr. Richard during a neurological follow-up on May 24, 2011. (AR 463). Treatment notes from that evaluation summarize Dr. Richard's findings as follows: "[Plaintiff's] hearing is completely normal. The MRI of the brain with and without contrast and

with attention to the internal auditory canals was reviewed. It is normal. The VNG test is abnormal, demonstrating an uncompensated, non-localized peripheral vestibular dysfunction." (*Id.*). Dr. Richard also noted "more emotional aspects to the symptoms" and prescribed a low dosage of Valium to be taken as needed. (*Id.*). Records from an initial evaluation at Leesburg Physical Therapy & Sports Medicine on June 3, 2011 provide: "Symptoms began in January and came on suddenly. They have gotten worse over the last 6 months." (AR 365). Those records also indicate that plaintiff was capable of basic independent care, but was unable to drive. (*Id.*).

As instructed, plaintiff returned to Professional Hearing Services: The Dizziness and Balance Center for an electrocochleography ("ECoG") examination on June 1, 2011. (AR 353). The results from that examination, according to Dr. Richard, suggested the presence of left-sided Meniere's disease – a condition commonly associated with endoplymphatic hydrops.[4]  (AR 462). Dr. Richard prescribed Diamox (250 mg) with directions to return for a follow-up visit in one month. (*Id.*). When plaintiff returned on June 27, 2011, Dr. Richard increased the dosage of Diamox (500 mg) along with instructions to discontinue Valium. (AR 461). Dr. Richard also noted that plaintiff did not complete physical (vestibular) therapy as planned, with earlier records suggesting that plaintiff was unable to complete the sessions due to "excessive dizziness." (AR 461–62). Following another neurological examination on July 11, 2011, Dr. Richard instructed plaintiff to discontinue use of Diamox and address current symptoms through vestibular rehabilitation. After attempting to contact two vestibular disorder specialists, plaintiff returned to Dr. Richard on July 22, 2011 who prescribed Meclizine and made arrangements to follow-up with one of the specialist. (AR 459).

---

[4] Endolymphatic hydrops is a disorder of the vestibular system, characterized by abnormal fluctuations in the endolymph fluid, which fills the hearing and balance structure of the inner ear. These fluctuations cause an increase in pressure in the endolymphatic system of the inner ear, which in turn may cause hearing loss, tinnitus, and balance problems. On the "Electrocochleography (ECoG) Report issued by the attending audiologist notes "[e]levated SP/AP on the left side may suggest endolymphatic hydrops." (AR 353).

Plaintiff also sought treatment for unrelated gastrointestinal issues during this time. Following a physical examination at the Colon, Stomach, & Liver Center, LLC on June 30, 2011, the attending gastroenterologist diagnosed plaintiff with temporary rectal bleeding that was "more than likely hemorrhoidal" and directed plaintiff to follow-up if symptoms reoccur. (AR 392). While available medical records are unclear on the underlying cause, bleeding subsided once plaintiff discontinued use of penicillin for the treatment of strep throat. (AR 391).

On July 27, 2011, plaintiff completed a "Function Report" that describes plaintiff's injuries and limitations caused by those injuries. (AR 262–69). In the report, plaintiff described a daily routine involving limited physical mobility. Aside from personal hygiene, plaintiff's activities were limited to eating meals, watching television, carrying clothes to the laundry room, and cooking eggs. (AR 264, 266). Plaintiff also described weekly trips to the grocery store with his wife. (AR 265). The report is unclear with respect to plaintiff's ability to drive on a consistent basis.[5] And while the report establishes a considerable degree of independence with respect to personal care, it does mention occasional assistance when moving in and out of the bathroom. (AR 263, 269). Other reports completed during this time include a "Pain Questionnaire" (AR 252–53), "Work History Report" (AR 254–61), and "Disability Report" (AR 239–51).

On August 29, 2011, plaintiff underwent a clinical examination at the direction of Virginia's Disability Determination Services, where he reported dizziness, tinnitus, nausea, and recurrent falls at home due to vertigo. (AR 397–402). The report states that plaintiff first began experiencing symptoms associated with tinnitus and vertigo in January 2011, but "has not seen a doctor because he was afraid of losing his job." (AR 397). Swarupa Esanakula, M.D. ("Dr.

---

[5] In response to the question "When going out, how do you travel?" plaintiff selected "Ride in a car" and stated in a subsequent answer: "My wife do not trust my [sic] to go out by myself [sic]. I drove befor[e]. But now I drive when I have too. And when someone with me." (AR 265).

Esanakula") noted a history of injuries in both the right shoulder and right knee that were addressed with surgery, but were otherwise unreported by plaintiff during the physical examination. (*Id.*). The functional evaluation provided by Dr. Esanakula indicates that plaintiff could be expected to stand/walk for 2-3 hours and sit for 2-3 hours during an 8 hour workday with normal breaks, although "dizziness may not permit him to walk or stand beyond 15-20 minutes at a time." (AR 400). Dr. Ensanakula incorporated these limitations through a postural restriction that applied to walking, sitting, and standing – but opined that plaintiff could perform these tasks frequently. (AR 401). Dr. Esanakula also found that plaintiff could lift/carry 10-20 pounds frequently and 20 pounds occasionally without any manipulative, communicative, or environmental limitations. (AR 400–01). Lastly, Dr. Esanakula noted that while it was possible for plaintiff's vertigo and dizziness symptoms to improve with medication, they would likely persist and worsen without treatment. (AR 399). A supplemental evaluation submitted by Dr. Esanakula on September 28, 2011 assessed plaintiff's extremity strength, coordination, gait, station, and reflexes as normal. (AR 410).

Plaintiff returned for a follow-up examination with Dr. Richard on September 12, 2011, complaining of right-side tinnitus. (AR 458). Treatment notes indicate that despite receiving contact information for a vestibular disorder specialist, plaintiff never made an appointment. (*Id.*). Plaintiff also discontinued use of Meclizine after discovering a comparable over-the-counter medication. (*Id.*). Dr. Richard recommended addressing symptoms through vestibular rehabilitation and prescribed a "nine-day taper" of prednisone. (*Id.*). Plaintiff returned approximately one year later without any major change in his condition or associated symptoms. (AR 457).

At the request of a primary care physician (Dr. Rajeshar S. Kadian), x-rays of plaintiff's right shoulder and right knee were obtained on September 13, 2011. (AR 403–04). The findings as to the right shoulder were unremarkable. (AR 403). The findings as to the right knee were as follows: "Smoothly marginated, well corticated ossific densities are seen on the lateral projection projecting along the inferior aspect of the patella. These are indeterminant. They could represent calcification from a patellar tendon injury or possibly loose bodies. A joint effusion is considered. No fracture, subluxation or dislocation is seen." (AR 404).

On October 11, 2011, Luc Vinh, M.D. ("Dr. Vinh") issued a "Disability Determination Explanation" for plaintiff's disability insurance benefits claim at the initial level. (AR 61–72). Plaintiff's initial claim for disability listed the following impairments: vertigo, knee problems, right shoulder problems, knee replaces (right and left), and bleeding ulcers. (AR 61). As a non-treating state agency physician, Dr. Vinh did not physically examine the plaintiff, but relied on available medical records and the clinical examination conducted by Virginia's Disability Determination Services.[6] (AR 66). Dr. Vinh determined that while plaintiff's medically determinable impairments could produce the alleged symptoms, the intensity of those symptoms as alleged were not supported by the objective medical evidence. (AR 67). Accordingly, Dr. Vinh found that plaintiff was capable of performing light work with the following restrictions: occasionally lifting and/or carrying 20 pounds, frequently lifting and/or carrying 10 pounds, standing and/or walking for approximately 6 hours in an 8-hour workday, sitting for approximately 6 hours in an 8-hour workday, and incorporated additional postural, manipulative, and environmental limitations. (AR 68–69). The vocational assessment concluded that it was unnecessary to determine whether plaintiff could return to past relevant work because "all

---

[6] A clinical examination was required at the initial level because "the evidence as a whole, both medical and non-medical, is not sufficient to support a decision on the claim." (AR 66). On reconsideration, a clinical examination was not required. (AR 93).

potentially applicable medical-vocational guidelines would direct a finding of 'not disabled,' given the [plaintiff]'s age, education, and RFC." (AR 71).

On October 26, 2011, plaintiff presented to the Virginia Spine Institute with pain in his lumbar spine and right leg. (AR 434). The initial physical evaluation conducted by Michael Hasz, M.D. ("Dr. Hasz") revealed significant paraspinal muscle spasm and local tenderness along the waistline and right sacroiliac joint. (AR 437). Lumbar spine radiographs were unremarkable except for slight wedging of the anterior endplates of L4, slight narrowing of disc heights at L4/5, and a small anterosuperior spur at T12. (AR 439). At the time, plaintiff was taking the following medications: Lisinopril/HCTZ, Diazepam, Prednisone, Meclizine, Motrin, and Tylenol. (AR 434). Dr. Hasz prescribed Medrol, Ultram, Relafen, and recommended physical therapy to address lumbar stabilization, mobilization, modalities and traction, and SI joint mobilization. (AR 435).

On March 6, 2012, William Amos, M.D. ("Dr. Amos") issued a Disability Determination Explanation for plaintiff's disability insurance benefits claim on reconsideration. (AR 87–99). As a non-treating state agency physician, Dr. Amos did not physically examine the plaintiff, but relied on available medical records. The reconsideration analysis provides, in part: "According to the application, there are no new sources that need to be requested. After completing a secondary review of the medical evidence, the evidence shows the clmt continues to be . . . ." (AR 93). The remainder of the analysis appears to have been omitted from the administrative record. In determining that plaintiff was not disabled under the applicable regulations, Dr. Amos noted that while medical records documented the pain associated with plaintiff's right shoulder and right knee "there is no evidence of muscle weakness or loss of control due to nerve damage." (AR 98). As for vertigo, "the evidence shows it does not significantly limit [plaintiff's] ability to

13

perform [his] usual activities." (*Id.*). While unclear if plaintiff could return to past relevant work, Dr. Amos concluded that the available evidence demonstrated plaintiff's ability to adjust to other work that could be performed within the applicable residual functional capacity. (*Id.*).

On September 24, 2012, plaintiff returned to Dr. Richard for another neurological examination to address recurring symptoms associated with tinnitus and vertigo. (AR 457). After conducting a physical examination, Dr. Richard noted that he was able to "induce a dizziness complaint with any movement." (*Id.*). Recognizing plaintiff's decision to disregard the most recent treatment recommendations, Dr. Richard re-prescribed the nine-day taper of prednisone and recommended a secondary consultation with the Vestibular Disorders Clinic at Johns Hopkins. (*Id.*). Dr. Richard also completed a "disability form" at plaintiff's request and instructed plaintiff to return if the prednisone was effective. (*Id.*).

On or about April 15, 2013, plaintiff began experiencing elevated levels of lower back pain. (AR 429). When the pain became severe, plaintiff sought treatment at a local urgent care center on April 20, 2013. (*Id.*). Shortly thereafter, plaintiff scheduled a physical examination with Dr. Hasz at the Virginia Spine Institute. (AR 431–32). That examination revealed tenderness over the left SI joint, right SI joint, and sacrum with restricted sacroliliac motion on the left with pain. (AR 431). The suggested treatment plan involved long-term corticosteroid treatment with follow-up SI injections and MRI scan if symptoms persist. (AR 431–32). Dr. Hasz also prescribed Vicodin and recommended continuing physical therapy. (AR 432). On April 29, 2013, four views of the lumbar spine were reviewed at the Virginia Spine Institute. (AR 433). Dr. Hasz observed some superior endplate compression of L4 and some angulation of the sacrococcygeal junction, but noted that both were stable when compared to prior x-rays from October 2011. (*Id.*). The only change was mild narrowed disc height at L3/4. (*Id.*).

On May 1, 2013, Dr. Richard completed a Physical Residual Functional Capacity Questionnaire where he indicated a diagnosis of Meniere's disease and "undetermined" prognosis. (AR 440–44). After accounting for certain limitations, Dr. Richard stated that plaintiff could be expected to sit for approximately 4 hours and stand/walk for less than 2 hours in an 8-hour workday. (AR 442). Dr. Richard also stated that plaintiff was incapable of lifting/carrying any amount of weight in a competitive work situation, stooping (bending), crouching (squatting), and climbing ladders. (AR 443). When asked to "describe any other limitations . . . that would affect your patient's ability to work at a regular job on a sustained basis," Dr. Richard provided the following: "The vertigo symptoms are constant. He cannot concentrate to perform a job." (AR 444).

Upon referral by a primary care physician (Holger Noelle, M.D.), plaintiff presented for a mental health evaluation at the Loudoun County Department of Mental Health, Substance Abuse and Developmental Services ("Loudoun County Department of Mental Health") on July 22, 2013. (AR 445). During an initial consultation, plaintiff described a two-year history of severe vertigo that eventually caused him to quit his job. (AR 446). Plaintiff also described instances of uncontrollable behavior, auditory and visual hallucinations, depression, and anxiety. (*Id.*). The following prescriptions were reported by plaintiff as "current medications": Citalopram (Celexa), Meclizine (Antivert), Atorvastatin Calcium (Lipitor), Metformin, and Hydrochlorothiazide. (*Id.*). Several other medications were prescribed to treat plaintiff's vertigo, but were discontinued when found to be ineffective.

Plaintiff returned to the Loudoun County Department of Mental Health on August 13, 2013, continuing to report depression. (AR 447). The attending psychologist, Ittamveetil N. Kutty, M.D. ("Dr. Kutty"), summarized the associated symptoms as follows: "nervous, irritable,

quick to lose his temper and would break things . . . impatient, tired, difficult with sleep onset and unable to sleep lying down. (*Id.*). Dr. Kutty also noted a decrease in appetite with plaintiff reporting significant weight loss "from 226 pounds to 176 pounds." (*Id.*). Dr. Kutty recommended that plaintiff discontinue Celexa and begin a trial of Pristiq along with a low dosage of Saphris. (*Id.*). Plaintiff returned for a follow-up visit on August 27, 2013 and reported some progress with the recently prescribed medications. (AR 448). Dr. Kutty's assessment indicates continuing depression and anxiety that impaired cognitive functioning and plaintiff's ability to "handle" a typical 40-hour work week. (*Id.*). Plaintiff was also instructed to supplement his current medications with Ativan to improve sleep. (*Id.*).

Plaintiff submitted to an independent medical examination on August 26, 2013. (AR 450). At the request of plaintiff's counsel, the examination was conducted by John A. Bruno, Jr., M.D. ("Dr. Bruno") and included a patient history, medical records review, and orthopedic examination. (AR 450–56). Following the examination, Dr. Bruno noted muscular atrophy and weakness of the supraspinatus in plaintiff's right shoulder, generalized enlargement of the right knee along with severe crepitus, medial joint tenderness, and limited range of motion in the lower back. (AR 451). Dr. Bruno also noted that plaintiff's chronic back pain and discogenic disease remained ongoing. (*Id.*). The report issued by Dr. Bruno found plaintiff to be "severely disabled, with poor use of his right upper extremity and right lower extremity, vertigo and chronic severe lower back pain affecting both lower extremities." (*Id.*). Progress notes provided by the Loudoun County Department of Mental Health also suggest that plaintiff was undergoing a diabetic evaluation during this time. (AR 446–47).[7]

---

[7] The multi-service progress note issued on July 22, 2013 provides: "Diabetes is being ruled out." (AR 446). Another multi-service progress note issued on August 13, 2013 provides: "Medical History: Diagnosed with DM type 2." (AR 447). The court has been unable to discover any treatment records addressing this condition and the parties have not raised the issue in their pleadings.

### C. ALJ's Decision on October 15, 2013

Determining whether an individual is eligible for disability insurance benefits requires the ALJ to employ a five-step sequential evaluation. It is this process the court must examine on appeal to determine whether the correct legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence. *See* 20 C.F.R. §§ 404.1520, 416.920. Specifically, the Commissioner must consider whether a claimant: (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals the requirements of a listed impairment and is thus considered *per se* disabling; (4) can return to past relevant work; and (5) if unable to return to past relevant work, whether claimant can perform other work that exists in significant numbers in the national economy. *See* 20 C.F.R. § 404.1520.

Here, the ALJ made the following findings of fact: (1) plaintiff meets the insured status requirements through December 31, 2015; (2) plaintiff has not engaged in substantial gainful activity since the alleged disability onset date of May 27, 2011; (3) plaintiff has the following medically determinable impairments: Meniere's disease/vertigo, cervical and lumbar degenerative disc disease, status post right knee medial meniscus tear (twice) and a lateral meniscus repair with questionable re-tear, status post right shoulder SLAP lesion repair and arthroscopic decompression, and obesity; (4) plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. § 404, Subpart P, App. 1; (5) plaintiff has the residual functional capacity to perform light work, as defined in 20 C.F.R. § 404.1567(b), assuming certain postural, manipulative, and environmental limitations[8]; (6) plaintiff is unable to perform any past relevant

---

[8] Those limitations include: "pushing and pulling is limited to the light level; no climbing of ladders, ropes, or scaffolds; no more than occasional climbing of ramps or stairs, balancing, stooping, crouching, kneeling, or crawling; no more than frequent handling, fingering, or feeling with the dominant right upper extremity; no

work; (7) plaintiff was forty-six (46) years old on the alleged disability onset date, which is defined as a younger individual age 18–49 under 20 C.F.R. § 404.1563; (8) plaintiff has at least a high school education and is able to communicate in English; (9) transferability of job skills is not material to the determination of disability because the Medical-Vocational Rules support a finding that plaintiff is "not disabled," regardless of whether plaintiff has transferable job skills; (10) considering plaintiff's age, education, work experience, and his above-mentioned residual functional capacity, there are jobs that exist in significant numbers in the national economy that plaintiff can perform; and (11) plaintiff has not been under a disability, as defined in the Social Security Act, from May 27, 2011 through the date of the ALJ's decision. (AR 15–25).

## IV. ANALYSIS

### A. Overview

On January 21, 2015, plaintiff filed a complaint in the United States District Court for the Eastern District of Virginia, invoking the jurisdiction of this court "pursuant to 42 U.S.C. § 405(g) [and 42 U.S.C. § 1383(c)(3)]." (Docket no. 1) (alteration in original).  The complaint seeks reversal of the Commissioner's final decision, denying plaintiff's claim for disability insurance benefits under Title II of the Social Security Act; or alternatively, an order remanding the case for further hearing and awarding attorney's fees under the Equal Access to Justice Act.

### B. The ALJ's Decision is Supported by Substantial Evidence

The overarching issue before this court is whether there is substantial evidence in the record to support the Commissioner's final decision that plaintiff was not disabled within the meaning of Title II of the Social Security Act on or before May 27, 2011, and whether the Commissioner—acting through the ALJ—applied the correct legal standards in reaching that

---

overhead reaching with the right upper extremity; no exposure to excessive vibrations; and no exposure to hazards (such as moving machinery and unprotected heights)." (AR 18).

decision. Plaintiff argues that the Commissioner's decision "is not supported by substantial evidence in the record as a whole, and is the result of application of improper legal standards." (Docket no. 17 at 1). Plaintiff's motion for summary judgment develops this argument by articulating three "failures" committed by the ALJ: (1) the ALJ failed to follow the treating physician rule; (2) the ALJ failed to identify appropriate functional limitations; (3) the ALJ failed to properly evaluate plaintiff's credibility. (Docket no. 17 at 2–3). The Commissioner rebuts these assertions, arguing that the ALJ considered all the evidence and utilized the correct legal standards in denying plaintiff's application for disability insurance benefits. Accordingly, substantial evidence supports the ALJ's findings. (Docket no. 20 at 2). The court will address each of plaintiff's arguments in the order presented.

### C. The ALJ's Opinion Adheres to the "Treating Physician Rule"

When an individual applies for disability, the review process often begins by obtaining medical records that document the observations of physicians when evaluating the nature and severity of the claimant's impairments. Pursuant to 20 C.F.R. § 404.1527(c), the ALJ must draw an important distinction between "treating" and "non-treating" sources. As a general rule, greater weight is given to opinions derived from treating sources, "since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s)." 20 C.F.R. § 404.1527(c)(2). The regulations also provide that a treating source's opinion is entitled to "controlling weight" when consistent with other substantial evidence in the record and supported by medically acceptable clinical and laboratory diagnostic techniques. Courts have commonly referred to this as the "treating physician rule." *See, e.g., Campbell v. Bowen*, 800 F.2d 1247, 1249 (4th Cir. 1986) (referencing the treating

physician rule as articulated in *Vitek v. Finch*, 438 F.2d 1157 (4th Cir. 1971) and *Mitchell v. Schweiker*, 699 F.2d 185 (4th Cir. 1983)).

Plaintiff argues that "[b]ecause the ALJ failed to follow the treating physician rule, the decision is not based on substantial evidence and must be vacated." (Docket no. 17 at 5). Specifically, plaintiff argues that the ALJ erred in declining to afford controlling weight to the opinions of Dr. Robert Richard, the treating neurologist. Upon closer examination, this argument develops two separate objections from a single plot. First, plaintiff argues the ALJ incorrectly departed from the "controlling weight" standard under 20 C.F.R. § 404.1527(c)(2). Second, after declining to afford Dr. Richard's opinions controlling weight, the ALJ failed to apply the criteria used to determine the proper amount of weight due. *See* 20 C.F.R. § 404.1527(c). In other words, even assuming Dr. Richard's opinions were entitled to less than controlling weight, the ALJ erred in determining the appropriate amount of weight to afford those opinions.

### 1. The ALJ did not err in affording the opinions of Dr. Richard less than controlling weight.

The treating physician rule is far from absolute. Rather, it is triggered when the opinion of a treating source is consistent with other substantial evidence in the record and supported by medically acceptable diagnostic techniques. *See, e.g., Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992) ("Although the treating physician rule generally requires a court to accord greater weight to the testimony of the treating physician, the rule does not require that the testimony be given controlling weight."). Therefore, the ALJ may choose "to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence." *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001). The Fourth Circuit has also "contemplate[d] the possibility

that such opinions may be rejected in particular cases in deference to conflicting opinions of non-treating physicians." *Campbell v. Bowen*, 800 F.2d 1247, 1250 (4th Cir. 1986).

Plaintiff began a series of consultations and examinations with Dr. Richard in April 2011 following a referral from his ear, nose, and throat specialist. (AR 373–74). During several of these visits, Dr. Richard reviewed test results from procedures that either Dr. Richard or another physician recommended. (AR 459, 462–64). Dr. Richard also conducted neurological examinations that assessed plaintiff's reported symptoms in an attempt to diagnose and treat the underlying cause. Dr. Richard's last examination that appears in the administrative record occurred on September 24, 2012. (AR 457). Following that examination, Dr. Richard noted plaintiff's noncompliance with prior treatment recommendations as well as limited variation in reported symptoms over the past year. (*Id.*). On May 1, 2013, seven months after his examination of the plaintiff, Dr. Richard completed a "Physical Residual Functional Capacity Questionnaire" where he indicated a diagnosis of Meniere's disease with an "undetermined" prognosis. (AR 440–44). After accounting for certain limitations, Dr. Richard stated that plaintiff could be expected to sit for approximately 4 hours and stand/walk for less than 2 hours in an 8-hour workday. (AR 442). Dr. Richard also stated that plaintiff was incapable of lifting and/or carrying any amount of weight in a competitive work situation and included additional postural limitations. (AR 443).

As noted by the ALJ, the opinions rendered by Dr. Richard with respect to plaintiff's limitations are contradicted by other evidence in the record. (AR 21–22). In fact, even the results of certain tests recommended by Dr. Richard suggest a milder manifestation of plaintiff's reported symptoms. For example, after examining the results from plaintiff's MRI and audiometry test on May 24, 2011, Dr. Richard made the following observations: "[Plaintiff's]

21

hearing is completely normal. The MRI of the brain with and without contrast and with attention

to the internal auditory canals was reviewed. It is normal." (AR 463). Only the VNG and

ECoG examination were "abnormal," with Dr. Richard recommending vestibular therapy to

address symptoms related to plaintiff's vertigo. (AR 461–63). That recommendation, which

also included referral to a vestibular disorder specialist, is notable insofar as it was otherwise

ignored by the plaintiff or at best, subject to limited pursuit. (AR 457–60).

On October 11, 2011, a non-treating state agency physician reviewed the available

medical findings and concluded that plaintiff was capable of performing light work, assuming

certain exertional, postural, and environmental limitations. (AR 68–70). On March 6, 2012, a

second non-treating state agency physician considered the available findings on reconsideration

and reached the same conclusion with respect to plaintiff's residual functional capacity. (AR

95–98). Both non-treating state agency physicians also considered the findings of a consultative

examiner, which "beyond noting a slow gait, was not noteworthy for significant symptoms

appreciated of imbalance or dizziness during the exam." (AR 22). Moreover, both

determinations reached similar conclusions when assessing the effect of vertigo and tinnitus on

plaintiff's ability to perform basic activities.

> The evidence also shows you able to stand, walk, and move about. Although you
> complain[] of ringing in you[r] ears, the evidence shows you [are] able to do your daily
> activities without severe limitations. (AR 71).

> With regard to your feelings of vertigo, the evidence shows it does not significantly limit
> your ability to perform your usual activities. Lastly, the evidence shows no other
> condition, which significantly limits your ability to work. (AR 98).

(AR 71). After evaluating these findings against the opinions rendered by Dr. Richard, the ALJ

chose to "afford[] some but not great weight to his opinions." (AR 23). The ALJ also referenced

other treatment options made available to plaintiff that were otherwise ignored or subject to

limited pursuit (e.g., certain prescriptions, physical therapy, and/or vestibular rehabilitation). (AR 22–23). Based on persuasive contrary evidence in the record, the ALJ utilized appropriate discretion in declining to afford controlling weight to the opinions of Dr. Richard.

> 2. *The ALJ sufficiently articulated the reasons for affording "some but not great weight" to the opinions of Dr. Richard.*

While the ALJ is granted a certain amount of discretion when evaluating the opinions of a treating physician, the ALJ cannot discount or limit those opinions without explanation. Instead, the ALJ must consider certain factors and provide good reasons for the weight given to the claimant's treating source's opinion. *See Blakley v. Commissioner of Social Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (quoting 20 C.F.R. 404.1527(c)(2)) ("Closely associated with the treating physician rule, the regulations require the ALJ to 'always give good reasons in [the] notice of determination or decision for the weight' given to the claimant's treating source's opinion."). These factors, as set forth under 20 C.F.R. § 404.1527(c), include: (1) the length of the treatment relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) the evidence with which the physician supports his opinion; (4) the consistency of the opinion with the record as a whole; (5) whether the physician is a specialist in the area in which he is rendering an opinion; and (6) any other relevant factors brought to the ALJ's attention. Recognizing this obligation, plaintiff argues that the ALJ "failed to apply the above listed criteria when categorically finding Dr. Richard's opinion 'not supported by treatment records' and Mr. Moaty's activities." (Docket no. 17 at 5).

Despite maintaining a regular treatment relationship with Dr. Richard from April 4, 2011 through September 12, 2011, the administrative record shows only one documented visit after September 12, 2011. (AR 457–64). The last documented visit on September 24, 2012 is also significant for its reference to plaintiff's non-compliance with prior treatment recommendations:

23

> It has been one year since he was last seen. When I saw him in September 2011, I recommended a trial of prednisone treatment for nine days and that he see Dr. Fitzgerald. It does not appear that he ever took the prednisone. . . . He has paperwork that needs to be completed. I could not complete this paperwork without seeing him as it has been one year since his last visit.

(AR 457). Thereafter, Dr. Richard recommended a nine-day trial of prednisone and directed plaintiff to return if the prednisone proved effective. (*Id.*) The record makes no mention of any further treatment or contact until May 1, 2013, when Dr. Richard completed a "Physical Residual Functional Capacity Questionnaire" at the request of plaintiff's counsel. (AR 440–44).

When considering Dr. Richard's findings in the questionnaire, the ALJ appropriately recognized the limited treatment relationship during that time.[9] The ALJ also considered Dr. Richard's opinions within the context of plaintiff's non-compliance with recommended treatment options and inconsistent presentations to other healthcare providers. (AR 23). While this analysis failed to systematically address each factor under the applicable regulations, the ALJ recognized Dr. Richard as the treating neurologist, carefully considered the treatment history, and impartially weighed the credibility of his opinions against other conflicting evidence. (*Id.*) Based on the ALJ's review of the record as a whole, the court is persuaded that the appropriate factors were considered when deciding to afford "some but not great weight" to the opinions rendered by Dr. Richard. *See Hamm v. Colvin*, No. 1:14cv0038, 2015 WL 165302, at *9 (E.D. Va. Jan. 12, 2015) (quoting *Burch v. Apfel*, 9 Fed. App'x 225, 259–60 (4th Cir. 2001)) ("The ALJ need not list each factor in the regulations concerning weight so long as the 'order indicates

---

[9] Dr. Richard described plaintiff's vertigo symptoms as "constant" and opined that plaintiff "cannot concentrate to perform a job." (AR 444). The court also notes that applicable social security regulations place no obligation on the ALJ to abide by the opinion of a treating physician, even when that source endeavors to determine whether an individual is or is not disabled. Rather, that determination is reserved for the ALJ. See 20 C.F.R. § 416.927(d)(1) ("A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled."). *See also Anderson v. Astrue*, 696 F.3d 790 (8th Cir. 2012) (substantial evidence supported conclusion of ALJ in application for disability insurance benefits to reject report of applicant's treating physician, where physician's opinion was conclusory and not supported by information contained in doctor's treatment notes and other medical records, report was a checkbox form, and applicant's daily activities belied physical limitations contained in physician's report).

consideration of all the pertinent factors.'"). Accordingly, the court finds that the ALJ adhered to the requirements set forth under 20 C.F.R. § 404.1527(c) in determining the appropriate amount of weight due to the opinions of plaintiff's treating neurologist.

### D. The ALJ Did Not Err in Determining that Plaintiff was Capable of Performing Light Work with Certain Exertional, Postural, and Environmental Limitations

In accordance with 20 C.F.R. § 404.1520, following a holistic review of the entire record, the ALJ found that while "claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms . . . the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." (AR 19). The ALJ went on to explain why certain evidence in the record did not substantiate plaintiff's claim of disability; instead finding plaintiff capable of performing light work, assuming certain postural, manipulative, and environmental limitations.[10] This determination, which occurs prior to step four of the five-step sequential evaluation process, establishes what the regulations refer to as a claimant's "residual functional capacity." See 20 C.F.R. § 404.1520(e).

A claimant's residual functional capacity defines what basic actions an individual is capable of performing despite his or her limitations. The claimant's residual functional capacity is then used by the ALJ to determine if the claimant is capable of returning to past relevant work, or if unable to return to past relevant work, whether the claimant is capable of adjusting to other work. Plaintiff argues that the ALJ's residual functional capacity assessment failed to account for the severity of certain symptoms associated with plaintiff's vertigo (i.e., dizziness) and, as

---

[10] 20 C.F.R. § 404.1567(b) provides: "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." The limitations accompanying plaintiff's residual functional capacity, as determined by the ALJ, include: "pushing and pulling is limited to the light level; no climbing of ladders, ropes, or scaffolds; no more than occasional climbing of ramps or stairs, balancing, stooping, crouching, kneeling, or crawling; no more than frequent handling, fingering, or feeling with the dominant right upper extremity; no overhead reaching with the right upper extremity; no exposure to excessive vibrations; and no exposure to hazards (such as moving machinery and unprotected heights)." (AR 18).

result, the ALJ failed to identify appropriate functional limitations after determining that plaintiff was capable of performing "light work" as defined in 20 C.F.R. § 494.1567(b). Contrary to the allegations raised by the plaintiff, the Commissioner argues the ALJ accounted for these symptoms to the extent they were consistent with the longitudinal record and crafted functional limitations accordingly.

It is well established that the ALJ is responsible for determining a claimant's residual functional capacity based on all relevant evidence in the record. *See* 20 C.F.R. §§ 416.945(a)(1), 416.946(c). This determination is a two-step process. First, the ALJ must determine whether there is an underling medically determinable physical or mental ailment that could reasonably be expected to produce the claimant's symptoms. Second, the ALJ must evaluate the intensity, persistence and limiting effects of those symptoms in order to determine the extent of their effect on the claimant's ability to engage in work-related activities. *See Craig v. Chater*, 76 F.3d 585, 594 (4th Cir. 1996). Here, the ALJ determined that "claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms" but found that numerous inconsistencies throughout the record as well as sporadic, conservative, or non-existent treatment failed to support plaintiff's statements concerning the intensity, persistence, and limiting effect of certain symptoms. (AR 19). In conducting this analysis, the court finds that the ALJ properly considered all symptoms established by the record to the extent those symptoms were consistent with objective medical evidence and other evidence based on the requirements of 20 C.F.R. § 404.1529 and SSRs 96-4p and 96-7p. This also includes the ALJ's evaluation of opinion evidence in accordance with the requirements of 20 C.F.R. § 404.1527 and SSRs 96-2p, 96-5p, 96-6p, and 06-3p.

During the hearing before the ALJ, plaintiff testified that his tinnitus manifests as a constant buzzing sound when stationary, but becomes an "ocean sound" that is capable of inducing dizziness with movement. (AR 44–45). The ALJ also questioned plaintiff about his current treatment plan for addressing symptoms related to vertigo. (AR 52). Plaintiff's response indicated that Dr. Richard prescribed medication to address these symptoms, which was unsuccessful, and also discussed the possibility of surgery. (AR 53). When asked to describe a typical or average day, plaintiff responded that he stays home and limits his movement to avoid aggravating his vertigo. (AR 53). In arguing that the ALJ's residual functional capacity determination failed to properly account for the severity of symptoms associated with plaintiff's vertigo, the plaintiff relies on self-serving allegations and the opinions of Dr. Richard as memorialized in the "Physical Residual Functional Capacity Questionnaire." As previously noted, the opinions rendered by Dr. Richard addressing the severity of these symptoms are contradicted by other evidence in the record. (AR 21–22). For example, after considering the available objective medical evidence related to the treatment of plaintiff's vertigo and tinnitus, both non-treating state agency physicians reached the same conclusion with respect to the severity of the alleged symptoms, finding that plaintiff was capable of performing basic day-to-day activities without limitation. (AR 71, 98). The "Function Report" completed by plaintiff on July 27, 2011 also contains contradicting statements with respect to the severity of these symptoms. (AR 262–69). For example, plaintiff indicates that dizziness affects his movements "which consist of any physical activities" but was otherwise capable of walking, sitting, talking, hearing, seeing, understanding, following instructions, and using his hands without limitation. (AR 267). The report also establishes a considerable degree of independence with respect to

personal care, mentioning occasional assistance when moving in and out of the bathroom.  (AR 263, 269).

Based on the foregoing, the court finds that substantial evidence supports the determination that plaintiff was capable of performing "light work" assuming certain postural, manipulative, and environmental limitations and that these functional limitations properly accounted for the severity of plaintiff's symptoms to the extent those symptoms were consistent with the longitudinal record.  For example, additional limitations such as "no exposure to excessive vibrations; and no exposure to hazards (such as moving machinery and unprotected heights)" and additional limitations on climbing, stooping, balancing, and kneeling account for a credibly established level of dizziness.

### E. The ALJ Properly Evaluated Plaintiff's Credibility

The final argument raised by plaintiff attacks the ALJ's credibility determinations.  As previously stated, the ALJ determined plaintiff's residual functional capacity after evaluating the symptoms associated with those medically determinable "severe" impairments in accordance with the requirements of 20 C.F.R. § 404.1529.  Once the ALJ found that certain impairments could reasonably be expected to cause the alleged symptoms, the ALJ evaluated the intensity, persistence, and limiting effects of those symptoms in order to determine the extent to which they limit plaintiff's functioning.  Accordingly, part two of the residual functional capacity analysis requires the ALJ to make several credibility determinations with respect to each of the plaintiff's "severe" impairments.[11]

---

[11] The impairments or combination of impairments the ALJ found to be "severe" under step two of the five-step sequential analysis include: Meniere's disease/vertigo, cervical and lumbar degenerative disc disease, status post right knee medical meniscus tear (twice) and a lateral meniscus repair with a questionable re-tear, status post right shoulder SLAP lesion repair and arthroscopic decompression, and obesity.  (AR 15).  The ALJ also evaluated plaintiff's claims of disabling mental health symptoms.  (AR 21).

After careful consideration of the evidence, the ALJ determined that while "claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms . . . the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." (AR 19). Plaintiff objects to the ALJ's credibility determinations in general terms, arguing that "[t]he ALJ failed to properly evaluate Mr. Moaty's credibility." (Docket no. 17 at 3). In response, the Commissioner argues the ALJ appropriately weighed the conflicting evidence and arrived at a reasonable determination with respect to the plaintiff's credibility and subjective allegations concerning the intensity, persistence, and limiting effects of certain symptoms. (Docket no. 20 at 16).

The court finds it both unnecessary and inappropriate to re-weigh the evidence considered by the ALJ to assess whether the ALJ's credibility determinations are supported by substantial evidence. After conducting an extensive review of the record in this matter, the court finds several instances where plaintiff's subjective statements concerning the intensity, persistence, and limiting effects of certain symptoms are supported by objective medical evidence. Similarly, there are other opinions and objective medical findings that contradict plaintiff's subjective evaluation of these symptoms. While a secondary review of the administrative record could conceivably arrive at a different result with respect to the credibility afforded to plaintiff's self-reporting, "it is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment for that of the Secretary if his decision is supported by substantial evidence." *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Here, the ALJ also had the opportunity to observe the plaintiff during the hearing and make a determination as to his credibility. Therefore, the Commissioner's findings as to any fact, if the findings are supported by substantial evidence, are

29

conclusive and must be affirmed. *See Richardson v. Perales*, 402 U.S. 389, 390 (1971). Moreover, the Commissioner is charged with evaluating the medical evidence and assessing symptoms, signs, and medical findings to determine the functional capacity of the claimant. *See Hays*, 907 F.2d at 1456–57.

In assessing a claimant's subjective statements of pain or other symptoms the ALJ must take into account all available evidence, including claimant's statements regarding the extent of those symptoms, and must provide specific reasons for the weight given to the claimant's statements. *See Craig v. Chater*, 76 F.3d 585, 595–96 (4th Cir. 1996); *see also* SSR 96-7p. While the regulations specifically provide for the consideration of objective medical evidence when evaluating intensity and persistence, "because pain is subjective and cannot always be confirmed by objective indicia, claims of disabling pain may not be rejected 'solely because the available objective evidence does not substantiate [the claimant's] statements' as to the severity and persistence of her pain." *Craig*, 76 F.3d at 595 (quoting 20 C.F.R. § 404.1529(c)(2)). Objective findings are still relevant however, as there is no obligation under the applicable regulations that the ALJ accept unsubstantiated allegations that are inconsistent with available objective evidence of the underlying impairment.

At the hearing before the ALJ on September 9, 2013, plaintiff testified that he is unable to travel outside the home, requires assistance when using the restroom, and is severely limited by his vertigo to the point where he "cannot do any, anything . . . . It's dizziness all the time, sleep all the time." (AR 53). After considering this testimony along with other examinations and opinions, the ALJ found that "claimant's therapy records note a much better presentation than the claimant's presentation at the hearing." (AR 22). For example, plaintiff's "Function Report" indicated that plaintiff was capable of driving when necessary and regularly accompanied his

30

wife to the grocery store on a weekly basis. (AR 265). Similarly, both the consultative examination and subsequent "Neurological Evaluation Supplement" conducted by Dr. Esanakula failed to report any neurological deficits or manifestations of dizziness and imbalance. (AR 397–401, 410). Despite some significant gaps between treatment records, several symptoms associated with plaintiff's severe impairments remained consistent year-to-year to the extent those symptoms were reported in objective medical findings and discussed by the treating and non-treating physicians.[12]

In evaluating the intensity, persistence, and limiting effects of these severe impairments, the ALJ properly viewed plaintiff's subjective allegations with a healthy degree of skepticism after accounting for instances of noncompliance, significant gaps in treatment history, and inconsistent presentations documented throughout the administrative record. The ALJ also incorporated exertional, postural, and environmental limitations into plaintiff's residual functional capacity in light of plaintiff's testimony at the hearing concerning his limited mobility and concentration. Based on the foregoing, the court finds that the ALJ adhered to the applicable regulation in evaluating plaintiff's credibility and provided a clear rationale when determining that certain allegations regarding the intensity, persistence, and limiting effects of plaintiff's symptoms were not entirely credible or consistent with the record as a whole. Accordingly, the ALJ's conclusions regarding plaintiff's credibility are based on substantial evidence.

### F. Dr. Richard's Medical Source Statement Falls Outside of the Administrative Review Period and Plaintiff has Failed to Demonstrate Good Cause for Remand

42 U.S.C. § 405(g) provides, in part: "the Commissioner of Social Security . . . may at any time order additional evidence to be taken before the Commissioner of Social Security, but

---

[12] For example, despite a considerable amount of subjective evidence in the administrative record indicating that symptoms associated with plaintiff's vertigo became more severe over time, Dr. Richard noted during the most recent neurological evaluation on September 24, 2012 that "[plaintiff] has not noticed any major change in his condition in the past year." (AR 457).

only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." On April 28, 2015, plaintiff filed his motion for summary judgment along with a medical source statement signed by Dr. Richard on January 16, 2015. (Docket nos. 17, 17-1). Plaintiff cites to the findings and opinions therein, arguing that his condition has substantially deteriorated. (Docket no. 17 at 2). While 42 U.S.C. § 405(g) has been interpreted to generally preclude the reviewing district court from considering evidence outside the certified administrative record, courts in the Eastern District of Virginia have "construed the term 'good cause' liberally to achieve the remedial purposes of the Social Security Act." *Goff v. Harris*, 502 F. Supp. 1086, 1089 (E.D. Va. 1980). However, when a claimant seeks to have a case remanded, "he bears the burden of showing that the newly discovered evidence bears directly and substantially on the issues decided, that it is not merely cumulative, and that it has a reasonable chance of altering the decision of the [Commissioner]." *Id.* at 1089–90 (citing *Hoss v. Gardner*, 403 F.2d 221 (4th Cir. 1968)).

The Commissioner properly construes plaintiff's recent submission as "a request for remand so that he may present this additional evidence to the agency in the first instance," arguing that plaintiff fails to demonstrate both materiality and good cause as required under 42 U.S.C. § 405(g). (Docket no. 20 at 23). Given the complete absence of information concerning the frequency of Dr. Richard's examinations between September 24, 2012 and the date of the ALJ's decision, the court is limited in its ability to analyze whether "good cause" exists for the failure to incorporate these recent findings into the administrative record prior to the ALJ's decision. Moreover, plaintiff's brief makes no effort to address issues of materiality. Because it is plaintiff who bears the burden of proof on newly discovered evidence, it is unnecessary for the

32

court's analysis to proceed further.  To the extent Dr. Richard provided treatment after the ALJ's

decision and opined additional limitations, plaintiff's remedy is limited to filing a new

application for disability pursuant to 20 C.F.R. § 404.620(a)(2).  The evidence currently before

the court consists of treatment records made part of the administrative record prior to the ALJ's

decision on October 15, 2013 and plaintiff has failed to demonstrate good cause as to the

recently submitted medical source statement.

## V. CONCLUSION

Based on the foregoing, the court finds that the Commissioner's final decision rendered

on October 15, 2013, denying benefits for the period May 27, 2011 through the date of the

decision, is supported by substantial evidence and that the proper legal standards were applied in

evaluating that evidence.  Accordingly, plaintiff's motion for summary judgment (Docket no. 17)

is denied; the Commissioner's motion for summary judgment (Docket no. 18) is granted; and the

final decision of the Commissioner is affirmed.

Entered this **6**ᵗʰ day of July, 2015.

_____/s/_____

John F. Anderson

United States Magistrate Judge

John F. Anderson
United States Magistrate Judge

Alexandria, Virginia

33